UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 3 0 2015
```

Donna Belda,

          Plaintiff,

    —v—

Sandee Doerfler,

          Defendant.

14-cv-941 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

    This case concerns a dispute over the disposal of assets once owned by the late Dr.

George Roston ("George" or "Dr. Roston").  Plaintiff Donna Belda ("Belda") alleges that the

Defendant, Sandee Doerfler ("Sandee" or "Doerfler"), tortiously deprived her of various

brokerage and retirement accounts that Dr. Roston and his predeceased wife, LaVerne Roston

("LaVerne"), had promised to her.  Doerfler now moves for summary judgment pursuant to

Federal Rule of Civil Procedure 56.  For the reasons below, her motion is GRANTED.

## I.    BACKGROUND[1]

    Dr. George Roston, a dentist by profession, died on May 24, 2012 in North Carolina.  *See*

Pl.'s 56.1 Statement ¶ 1.  For the majority of his life, including for the period relevant to this

case, Dr. Roston lived in New York City.  *Id.* ¶ 2.  In 1970, Dr. Roston met Sandee Doerfler, the

sole remaining Defendant. [2]  *Id.* ¶¶ 6, 7.  It is undisputed that the two had a brief, intimate

relationship, though the parties disagree over the extent to which Dr. Roston and Doerfler

---

[1] Unless otherwise noted, the following facts are not in dispute and are taken from the Plaintiff's Counter-Statement of Material Facts ("Pl.'s 56.1 Statement").
[2] The Court dismissed Plaintiff's claims against Robert Roston (George's brother) and Anne Weiskopf (Robert's daughter and George's niece) on October 30, 2014.  *See* Dkt. No. 45.

1

remained friends over the subsequent decades. *Id.* ¶¶ 7, 10-12.  In 1988, Sandee married Jerry Doerfler.  *Id.* ¶ 8.  And in 1989, George married LaVerne Roston.  *Id.* ¶¶ 3, 9.

The Plaintiff, Donna Belda, was LaVerne's sister and George's sister-in-law.  *Id.* ¶ 4.  LaVerne was diagnosed with ovarian cancer in 2005, and by 2008, her health had deteriorated.  *Id.* ¶ 15.  Belda, who was living in Pittsburgh at the time, moved to New York to help care for LaVerne.  *Id.*  In June 2008, when Belda returned to Pittsburgh for a week, George asked Doerfler to travel to New York to assist him in caring for LaVerne.  *Id.* ¶ 16.  Doerfler's husband had passed away in 2002, and Doerfler was living in North Carolina.  *Id.* ¶ 14.

Around this time, George and LaVerne began organizing their financial affairs in anticipation of their eventual passing.  As of January 1, 2009, George individually owned a Bernstein Global Wealth Management Account ("Bernstein Account"), and four T. Rowe Price IRA accounts (the "TRP Accounts").  *Id.* ¶ 18.  George and LaVerne jointly owned, with rights of survivorship, a Chase Premier Platinum savings and checking account ("Chase Account" and, collectively with the Bernstein Account and the TRP Accounts, the "Accounts").  *Id.* ¶ 19.  LaVerne individually owned a Charles Schwab Account ("Schwab Account") and an HSBC IRA Account ("HSBC Account"), both of which designated Belda as the death beneficiary.  *Id.* ¶ 20.  In early 2009, George designated LaVerne as the primary beneficiary of the Bernstein Account and the TRP Accounts, naming Belda as the secondary beneficiary.  *Id.* ¶ 21.  George and LaVerne also designated Belda as the primary beneficiary of their jointly held Chase Account.  *Id.*  After making this initial designation of beneficiaries, LaVerne and George gave the designation papers for the Bernstein Account and TRP Accounts to Belda.  *Id.* ¶ 24.

The parties dispute the understanding that existed between George, LaVerne, and Belda at this time.  Belda contends that the three of them shared an understanding that the designations

2

were contractual, permanent, and non-revocable. *Id.* ¶ 22.  Conversely, Doerfler alleges that George, LaVerne, and Belda reached no such agreement. *Id.*  Belda does agree, however, that she did not discuss with the Rostons whether the survivor of George and LaVerne would possess the ability to change the beneficiaries of the Accounts after one of them died. *Id.* ¶ 23.  She further acknowledges that she never discussed with LaVerne and George the disposition of their assets after their deaths. *Id.* ¶ 25.  Finally, Belda admits that no written instrument established that the 2009 designations were irrevocable. *Id.* ¶ 60.

LaVerne passed on May 17, 2009, shortly after the initial beneficiary delegations were made. *Id.* ¶ 26.  George therefore became the sole owner of the Chase Account, the Schwab Account, and the HSBC Account, and he remained the sole owner of the Bernstein Account and the TRP Accounts. *Id.*  The parties agree that, in the wake of LaVerne's death, George entered a period of intense and severe depression, although they dispute whether this affected his mental capacity to such an extent that it rendered him legally incompetent to enter contracts or make testamentary decisions. *Id.* ¶¶ 28, 37-39.

After LaVerne's death, Belda assumed sole ownership of an apartment on the Upper East Side of Manhattan that she and LaVerne had purchased years before. *Id.* ¶ 27.  Belda resided at the apartment, though she periodically made trips to Pittsburgh in order to attend to business affairs and check on property she still owned there. *Id.* ¶ 29.  While living in Manhattan, Belda assisted George by buying him groceries, escorting him to doctor's appointments, and keeping him company. *Id.* ¶ 31.  On at least one occasion, during one of Belda's trips to Pittsburgh, Doerfler visited George for about a week, although the parties dispute whether George or Doerfler proposed the visit. *Id.* ¶ 30.  In the spring of 2010, Belda informed George that she

could no longer afford to continue living in both New York and Pittsburgh, and that she would have to sell the Manhattan apartment and return to Pittsburgh. *Id.* ¶ 32.

On August 3, 2010, Belda returned to Pittsburgh in preparation for her impending move. *Id.* ¶ 33. On August 9, 2010, Doerfler again traveled from North Carolina to New York with the intent of staying with George for two or three weeks. *Id.* ¶ 34. The parties again dispute whether it was George or Doerfler who suggested this trip. *Id.* On September 2, 2010, Belda sold the Manhattan apartment and permanently relocated to Pittsburgh. *Id.* ¶ 35. At George's request, Doerfler remained in New York for over a year, until December 2011, at which point she arranged for George to return with her to North Carolina and to be put in an assisted living community. *Id.* ¶ 40.

The central dispute in this case concerns events that took place during the sixteen-month period when Doerfler stayed with George in New York. Shortly in the wake of Doerfler's August 9, 2010 arrival, George executed a series of beneficiary redesignations to the various Accounts he then controlled. On August 20, 2010, he redesignated the Bernstein Account to make Doerfler a 50 percent beneficiary, with the remaining 50 percent going to his niece, Anne Weiskopf ("Weiskopf"). *Id.* ¶ 43. On September 4, 2010, George redesignated the TRP Accounts to grant Doerfler a 60 percent interest, with the remaining 40 percent designated for his brother, Robert Roston (Weiskopf's father). *Id.* Finally, on June 13, 2011, George redesignated the Chase Account to make Doerfler the sole beneficiary. *Id.* On October 17, 2011, George granted Doerfler a general power of attorney ("POA") over his affairs. *Id.* ¶ 67. Although the parties dispute whether Doerfler used that general POA for any purpose, *id.* ¶ 68, there is no dispute that she did not have the POA during any of the dates upon which George re-designated the beneficiaries to the various Accounts. *Id.* ¶ 66. The parties are in agreement that Doerfler

4

never threatened or coerced George into redesignating his accounts. *Id.* ¶¶ 70-73. But the parties do dispute the extent to which Doerfler caused George to rearrange the disposition of the Accounts. *Id.* ¶ 74. They similarly dispute whether Doerfler took good care of George during her prolonged stay with him in New York. *Id.* ¶¶ 75-76.

When George passed on May 24, 2012, the Accounts, together with the Schwab and HSBC Accounts formerly owned by LaVerne, contained a total of approximately $2,023,000 in assets. *Id.* ¶ 86. Of that sum, approximately $290,000 went to his brother, Robert; approximately $516,000 to his niece, Weiskopf; approximately $204,000 to Belda; and nearly all of the remainder, about $1,000,000, to Doerfler. *Id.* Belda commenced this action on February 14, 2014 and, after the Court dismissed Weiskopf and Robert Roston as Defendants in October 2014, Doerfler filed the instant motion for summary judgment on February 10, 2015. *See* Dkt. Nos. 45, 50.

## II.     LEGAL STANDARD

Summary judgment is properly granted when, after reviewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). For summary judgment purposes, a genuine issue exists if the evidence is such that a reasonable jury could decide in the non-moving party's favor. *Id.* "[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). However, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d

199, 204 (2d Cir. 2009). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted). "More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks and citations omitted).

## III.   DISCUSSION[3]

The parties' briefing primarily focuses on three areas of dispute: (1) whether Doerfler mistreated or exercised undue influence over George during the time she stayed with him in New York between August 2010 and December 2011; (2) whether George was mentally competent to be managing his financial affairs at the time he redesignated the beneficiaries of the Accounts in August-September 2010 and June 2011; and (3) whether LaVerne, George, and Belda intended the initial designations in 2009 to be irrevocable, such that Belda has an entitlement to them regardless of the validity of George's subsequent redesignations. Belda contends that these three areas of dispute present a number of genuine issues of material fact, thus precluding summary judgment. But Belda largely abstains from addressing how these factual disputes affect the elements of her claims. Accordingly, the Court proceeds claim by claim to determine whether genuine issues of material fact remain for trial. Because Belda raises only state law causes of action in this diversity suit, the Court applies New York law.

### A.   Unjust Enrichment, Constructive Trust, and Conversion

---

[3] Belda withdrew her fourth cause of action for fraud. *See* Pl.'s Br. 20 n.13.

Belda's first three claims against Doerfler are for unjust enrichment, constructive trust, and conversion. *See* Compl. ¶¶ 27-42. The elements of "an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (citing *Clark v. Daby,* 300 A.D.2d 732 (N.Y. App. Div. 2002)).[4]   The establishment of a constructive trust provides an equitable remedy in instances of unjust enrichment. *See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. Of Contemporary Dance, Inc.,* 380 F.3d 624, 646 (2d Cir. 2004) ("[T]he equitable remedy of a constructive trust is appropriate when there is clear and convincing evidence of (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment."). And conversion, under New York law, "is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Kirschner v.*

---

[4] Plaintiff's first count in her complaint, in addition to claiming unjust enrichment, puts forward a claim for money had and received and money due and owing. However, at no point in her briefing does Belda address either of these claims. As the Court explained in its October 31, 2014 Memorandum & Order, Belda's money had and received claim is essentially derivative of the unjust enrichment claim. The elements for a money had and received claim are that "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Panix Promotions, Ltd. v. Lewis*, No. 01-CV-2709 (HB), 2002 WL 122302, at *2 (S.D.N.Y. Jan. 22, 2002) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n,* 731 F.2d 112, 125 (2d Cir. 1984)). As the Court has explained, this cause of action is essentially identical to a claim of unjust enrichment. *See* Dkt. No. 45 at 7; *see also Maxus Leasing Grp., Inc. v. Kobelco Am., Inc.,* No. 04-CV-518 (FJS) (DEP), 2007 WL 655779, at *5, n.15 (N.D.N.Y. Feb. 26, 2007) (citing *In re Estate of Witbeck,* 245 A.D.2d 848, 850 (N.Y. App. Div. 1997)) ("The causes of action for unjust enrichment and money had and received are identical."); *see also J.C. Penney Corp. v. Carousel Ctr. Co., L.P.,* 635 F. Supp. 2d 126, 129 n.1 (N.D.N.Y. 2008) ("claims for unjust enrichment and money had and received are identical"). Further, as the Court also explained, courts within this District treat money had and received claims concomitantly with unjust enrichment claims where pled in a single count of the complaint. *See Robert Smalls Inc. v. Hamilton,* No. 09-CV-7171 (DAB) (JLC), 2010 WL 3238955, at *6 (S.D.N.Y. July 19, 2010). As to the money due and owing claim, that tort requires that the Defendant have "an express legal obligation to pay the monies due and owing" to the plaintiff. *Eastside Food Plaza, Inc. v. "R" Best Produce, Inc.*, No. 03-CV-106 (SAS), 2003 WL 21727788 (S.D.N.Y. July 23, 2003). Both Plaintiff's pleadings and her evidence at summary judgment are bereft of any reference to an express legal agreement between Doerfler and Belda. Indeed, the parties do not dispute that Doerfler and Belda never discussed George's finances together. *See* Pl.'s 56.1 Statement ¶ 101. Accordingly, Belda's claim for money due and owing cannot survive summary judgment.

*Bennett*, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006)).

To prevail on any of these three claims, Belda must demonstrate that Dr. Roston's decisions to designate Doerfler as a beneficiary of the Accounts were invalid. If she can do so, then she may be able to establish an equitable or possessory interest in the funds from the Accounts. *See Liberty Life Assur. Co. of Boston v. Bahan*, No. 09-CV-4715 (JSR), 2010 WL 3431147, at \*3 (S.D.N.Y. Aug. 23, 2010), *aff'd*, 441 F. App'x 21 (2d Cir. 2011) (unjust enrichment and conversion claims rested on whether redesignation of annuity beneficiary was invalid). If, however, Roston's decisions to redesignate the Accounts' beneficiaries were valid, then Belda "has no legal interest in the proceeds of the [Accounts] and her conversion and unjust enrichment claims must fail." *Id.* And as discussed above, if her unjust enrichment claim fails, there is no basis for imposing the equitable remedy of a constructive trust.

Belda advances two possible reasons for concluding that Roston's redesignations were invalid: undue influence and mental incapacity. For the reasons that follow, the Court ultimately concludes that Belda has failed to raise a genuine dispute of material fact that would permit her to prevail on either of these grounds.

### 1.    Undue Influence

In New York, a plaintiff alleging undue influence must establish: "(1) the existence and exertion of an influence; (2) the effective operation of such influence as to subvert the mind at the time the transaction [at issue] occurred; and (3) the execution of the transaction that, but for undue influence, would not have happened." *See Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 273 n.27 (S.D.N.Y. 2006) (citing *Halvorsen v. Sheive*, No. 02-CV-6187, 2004 WL 627939, at \*8 (W.D.N.Y. Feb.10, 2004)). At summary judgment, a "mere showing of opportunity and

even of a motive to exercise undue influence does not justify a submission of that issue to the jury, unless there is[,] in addition, evidence that such influence was actually utilized." *Medeiros v. John Alden Life Ins. Co. of N.Y.*, No. 88-CV-4399 (KMW), 1990 WL 115606, at *4 (S.D.N.Y. Aug. 10, 1990) (quoting *In re Walther's Will*, 6 N.Y.2d 49, 55 (1959)).

Belda fails to create a triable issue of fact on her allegation of undue influence because her evidence on this point goes no further than attempting to show opportunity and motive. For instance, Belda points to findings in a report produced by Dr. Stuart B Kleinman that "George's condition rendered [him] extremely susceptible to undue influence at the time that he changed the beneficiary designations on the Accounts." Pl.'s Br. 11 (citing Pl.'s Ex. 4 ("Kleinman Report")); *see also* Pl.'s 56.1 Statement ¶ 51 ("George's condition rendered him highly susceptible to undue influence and emotional manipulation."). Belda also presents opinion testimony from George's friends and family, who cast aspersions on Doerfler's motives, calling her a "gold digger" and a "thief," *see* Pl.'s Ex. 16, R. Roston Dep. 55:14–16; 56:6–57:10), and stating that she "had one goal – to strip George of any moneys he had left," R. Levy Decl. ¶ 9. While these facts, if proven, would permit a reasonable jury to infer that Doerfler had a position of influence over Roston, none of them would allow a jury to conclude that Doerfler actually took advantage of any such position with respect to the three decisions to redesignate the beneficiaries on the Accounts.

The same logic applies to the evidence that Doerfler accepted LaVerne's wedding band and other jewelry as gifts from George. *See* Pl.'s Ex. 17, "Doerfler Dep. 47:9–48:25. Belda does not point to evidence that links the provision of these gratuities to any effort on the part of Doerfler's to exert influence; she just asserts that the link is there. *See* Pl.'s Br. 11 (claiming that Doerfler made George "emotionally and psychologically dependent on her, which led George to

give [her] lavish gifts"). Belda similarly does not point to any evidence that would allow a reasonable jury to conclude that Doerfler exercised influence specifically with regards to the redesignations at issue here. Indeed, Belda acknowledges that no concerted plan or agreement existed between Doerfler, Weiskopf, and Robert to seek to have the Accounts' beneficiaries changed. *See* Pl.'s 56.1 Statement ¶ 51. Accordingly, in the absence of any evidence that Doerfler actually *exercised* undue influence over Dr. Roston, Belda cannot sustain her claims on such a theory. *See In re Favaloro*, 94 A.D.3d 989, 993 (N.Y. App. Div. 2012).

## 2.    Mental Incapacity

The Court next considers whether Dr. Roston was legally incompetent at the time of the redesignations. Because "New York presumes that a person is 'competent at the time of the performance of the challenged action[,] the burden of proving incompetence rests with the party asserting incapacity.'" *Bahan*, 2010 WL 3431147, at *3 (quoting *Sears v. First Pioneer Farm Credit, ACA*, 46 A.D.3d 1282, 1285 (N.Y. App. Div. 2007)).

The parties here disagree over whether the question of legal incompetence is controlled by the standard for testamentary capacity or the standard for contract capacity. If the standard for testamentary capacity applies, a court considers three factors: "(1) whether [the decedent] understood the nature and consequences of executing [the document]; (2) whether he knew the nature and extent of the property he was disposing of; and (3) whether he knew those who would be considered the natural objects of his bounty and his relations with them." *In re Estate of Alibrandi*, 104 A.D.3d 1175, 1175 (N.Y. App. Div. 2013) (alterations from original omitted) (quoting *Estate of Kumstar* 66 N.Y.2d 691, 692 (1985)). "Mere proof that the decedent suffered from old age, physical infirmity and dementia when the will was executed is not necessarily inconsistent with testamentary capacity and does not alone preclude a finding thereof." *Id.* at

1175-76 (quoting *In re Estate of Williams*, 13 A.D.3d 954, 957 (N.Y. App. Div. 2004)).  Rather, "the appropriate inquiry is whether the decedent was lucid and rational at the time the [document] was made."  *Id.* at 1176 (quoting *Williams*, 13 A.D.3d at 957).  Under the contract standard, mental capacity "is determined by a cognitive test: whether the person's mind was 'so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction.'"  *Rudolf Nureyev Dance Found. v. Noureeva-Francois*, 7 F. Supp. 2d 402, 416 (S.D.N.Y. 1998) (quoting *Ortelere v. Teachers' Ret. Bd.*, 25 N.Y.2d 196 (1969)).  The burden of demonstrating incompetence under this standard "is an extremely heavy one."  *Harrison v. Grobe*, 790 F. Supp. 443, 447 (S.D.N.Y. 1992), *aff'd*, 984 F.2d 594 (2d Cir. 1993).

Although it is difficult to prove incapacity under either standard, "[t]he standard for making a will is less rigorous: less 'capacity' is required because a will is a 'unilateral disposition of property,' sometimes made by a person who is ill and facing death."  *Rudolf Nureyev*, 7 F. Supp. 2d at 416 (quoting *In re Estate of ACN*, 509 N.Y.S.2d 966, 969 (Surr. Ct. N.Y. Cnty. 1986)).  Belda therefore contends that the contract standard is appropriate here.  She argues that the various beneficiary redesignation forms were styled as contracts, were in reference to formal "agreements" between Dr. Roston and the financial institutions managing the accounts, and contained standard contract clauses, terms, and conditions, such as merger clauses and governing law provisions.  *See* Pl.'s Exs. 5, 6.  Doerfler argues that the testamentary standard should apply because the redesignations were not in fact negotiated contracts between two independent parties, but rather a substitute for probate.  Courts within this District have applied both standards when reviewing a person's capacity to execute a change of beneficiary.  *Compare Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 326-27 (S.D.N.Y. 2014) (applying testamentary standard) *with Sun Life Assur. Co. of Canada (U.S.) v. Gruber*, No. 05-

CV-10194 (NRB), 2007 WL 4457771, at *14 n.48 (S.D.N.Y. Dec. 17, 2007) (applying contract standard).  In this case, the Court will apply the contract capacity standard because if Dr. Roston were sufficiently competent to meet that standard at the time of the redesignations, then he was necessarily competent under the testamentary standard as well.  *See Sun Life*, 2007 WL 4457771, at *14 n.48 ("In this case, we consider only the contractual standard, since if [the decedent] would be deemed capable of designating a beneficiary under the contractual standard, he would necessarily meet the less demanding testamentary standard.").

To prove that Dr. Roston was not legally competent to enter into a contract, Belda must show that Dr. Roston's depression and anxiety were so severe "as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction." *Rudolf Nureyev*, 7 F. Supp. 2d at 416 (S.D.N.Y. 1998).  Under this standard, Belda's evidence fails to raise a triable issue of material fact.  Belda's failure is not for a lack of evidence going to George's mental health and general wellbeing.  As described below, Belda has identified a significant amount of testimony—from friends, family, and psychiatrists—indicating that there were valid reasons to be concerned for George in the wake of LaVerne's passing.  But none of that testimony provides what is necessary to overcome Doerfler's motion for summary judgment—namely, a basis for a reasonable juror to conclude that George was legally incompetent at the times he redesignated the beneficiaries of the Accounts.

The evidence Belda points to on this issue broadly can be divided into three categories: the testimony of George's friends and relatives, the notes of two of his treating psychiatrists, and the forensic report of Dr. Kleinman.  As to the first set of evidence, Belda provides the testimony and declarations of a number of George's acquaintances, each of whom expressed concern about George's wellbeing and mental state after LaVerne's passing.  For instance, George's friend

12

Lynne Wilson, recalling a dinner outing sometime in December or late fall of 2010, testified that "George was not functional at that time as well.  He was slumping over.  [Doerfler] was ordering for him."  Pl.'s Ex. 15, Wilson Dep. 12:4-7.  Another friend, David Dickman, stated that in the year after LaVerne's death, George was "very depressed; at times catatonic; [he] was in a deep shell; and simply couldn't function."  Dickman Decl. ¶ 6.  Ruth and Victor Levy, friends of George and LaVerne's, recalled an outing with George and Belda in August 2010 during which George was "unusually very quiet and withdrawn."  R. Levy Decl. ¶ 8; V. Levy Decl. ¶ 9.  The Levys both stated that George had "fallen apart" in the wake of LaVerne's death and was "very depressed and at times completely out of it."  R. Levy Decl. ¶ 7; V. Levy Decl. ¶ 8.

Belda's second category of evidence is the treatment notes of two of George's psychiatrists.  Dr. Phillip Saltiel, who treated George through the spring and summer of 2010, reported in early March 2010 that George was "quite depressed" and "anxious" and "overwhelmed."  *See* Pl.'s Ex. 10.  Dr. Saltiel's notes from June 8, 2010 reveal that George was "still depressed" and recommended that he undergo electroconvulsive therapy.  *Id.*  In their final meeting on July 23, 2010, Dr. Saltiel recorded that George was "sleepy" and "can't make decisions."  *Id.*  He further reported that George "[s]till doesn't feel like himself."  *Id.*  On August 11, 2010, George cancelled his appointment with Dr. Saltiel, but spoke with him briefly over the telephone.  *Id.*  Dr. Saltiel noted that George's mood remain unchanged.  *Id.*  Belda also introduces the notes of Dr. Linda Larkin, who treated George prior to Dr. Saltiel.  Her notes from March 2010 state that George felt "helpless and hopeless" and believed that "half of me [is] gone."  Pl.'s Ex. 11.

Third, Belda proffers the expert testimony of Dr. Kleinman, who filed a forensic psychiatric report on Dr. Roston's mental condition based upon his review of medical, financial,

documentary, and deposition testimony in this case. *See generally* Kleinman Report.[5]  Dr.

Kleinman was requested to investigate whether Dr. Roston was "in any fashion mentally

impaired" when two sets of events occurred: (1) when Roston "[c]hanged the beneficiaries,

including add[ing] Sandee Doerfler as a beneficiary, to his Alliance Bernstein, and T. Rowe

Price IRA, brokerage accounts;" and (2) when he "[g]ave Ms. Doerfler Power of Attorney on

October 17, 2011." *See* Kleinman Report at 3.

Dr. Kleinman concluded that "Dr. Roston was significantly cognitively impaired" during

the *second* period, "when he gave Ms. Doerfler power of attorney." *See* Kleinman Report at 19.

But with respect to Dr. Roston's capacity during the first set of events, i.e., the beneficiary

redesignations, Dr. Kleinman's concluded, in full, that:

> Dr. Roston was suffering from severe Major Depression with Anxious Distress at the
> time Ms. Doerfler came to New York in August 2010.  This disorder greatly exaggerated
> his longstanding need to avoid being alone, causing him to desperately wish to remedy
> the intensely painful solitude he was experiencing, and to be pathologically susceptible to
> the promised resolution of such that Ms. Doerfler represented.  As a function of this
> extreme neediness, and distorted perception of Ms. Doerfler, he precipitously gave her
> his wife's pearls, and very soon afterwards made her a 50% beneficiary of the assets in
> his Alliance Bernstein [sic].

*Id.* at 18.

Even viewing all this evidence in a light most favorable to Belda and making all

inferences in her favor, no reasonable jury could conclude from this evidence that Dr. Roston

lacked the capacity to redesignate the beneficiaries to his Accounts on the dates in question.

---

[5]  Doerfler argues that the Court should disregard Dr. Kleinman's testimony because it is contradicted by the
testimony of Dr. Roston's treating physician, Dr. Shinbach.  There does appear to be support for the proposition that
an expert's opinion, based upon a review of medical records, should be granted little, if any, weight at summary
judgment when the expert's opinion is contradicted by the decedent's treating physician. *See In re Estate of Swain*,
125 A.D.2d 574, 576 (N.Y. App. Div. 1986) ("Significantly, the expert's opinion was based upon an examination of
medical records which did not even cover the month when the will was executed.  His opinion was purely
speculative and was contradicted by the testimony of the testatrix's treating physician who found her to be lucid and
rational on every occasion on which he saw her. The speculative expert testimony, therefore, was entitled to no
weight.").  The Court need not reach this issue, however, because, even taking Dr. Kleinman's report into account,
Belda has failed to raise a triable issue of material fact.

Belda's evidence falls short for two independent reasons. First, the evidence does not permit a reasonable inference that Roston's impairment was sufficiently serious to render him "wholly and absolutely incompetent to comprehend and understand the nature of [his] transaction[s]." *Rudolf Nureyev*, 7 F. Supp. 2d at 416. Second, even assuming the evidence could establish that degree of incapacity, Belda has fallen short of her burden to prove that Roston was incompetent *at the time of the redesignations*.

The majority of Belda's evidence on incompetence goes to whether, and to what extent, Roston was depressed. But New York courts are clear that a diagnosis of depression, even if severe, is inadequate on its own to raise a triable issue as to an individual's capacity to enter into a contract. In *Blatt v. Manhattan Medical Group, P.C.*, 131 A.D.2d 48, 51 (1987), for instance, the court noted that the plaintiff "was severely depressed as a result of his father's death and possibly because of a personality disorder." But the court went on to hold that the "[t]he fact that he was in a severely depressed emotional state is scarcely sufficient indication that he did not have either the necessary understanding to execute a contract or that he was unable to control his behavior." *Id.* at 53. Similarly, the fact that George's friends indicated that he was severely depressed or unnaturally quiet in the years following his wife's death is not sufficient to raise a triable question as to George's legal competency. The same logic applies to the observations of Dr. Saltiel and Dr. Larkin, and the conclusion of Dr. Kleinman, that George was severely depressed and anxious over the period of time in which he made the redesignations. The parties do not dispute these diagnoses, only the extent to which they impacted Dr. Roston's capacity. *See* Pl.'s 56.1 Statement ¶ 28 ("After La Verne's death, George suffered from severe depression."). But Belda has provided "no evidence . . . that [George's] depression caused [him] to lack contractual capacity or that [his decisions were] the result of impulsive or irrational behavior

15

beyond [his] control." *Willgerodt ex rel. Majority People's Fund for the 21st Century, Inc. v. Hohri*, 953 F. Supp. 557, 560 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998).

The evidence upon which Belda places the greatest reliance—Dr. Saltiel's observation on July 23, 2010 that George was "sleepy" and "can't make decisions"—is not sufficient to supply this missing link. *See* Pl.'s Ex. 10. The fact that Dr. Roston was having difficulties making decisions a month before the first redesignation is insufficient to suggest that he was legally incompetent to comprehend the decisions he *did* make to redesignate the beneficiaries on the Accounts. Comparably insufficient is Dr. Kleinman's conclusion that Roston's generosity towards Doerfler was prompted by his depression and need for companionship. *See* Kleinman Report at 18. That Dr. Roston's depression may have *affected* his actions falls short of evidence that would permit a reasonable jury to conclude that Dr. Roston was incapable of comprehending or understanding the nature of his actions.

The only evidence that fairly would allow a jury to infer the required level of incompetence is Dr. Kleinman's conclusion that Dr. Roston was "significantly cognitively impaired" when he granted Doerfler power of attorney and was therefore "unable to reasonably fully consider the power which he granted." *See* Kleinman Report at 19. But that was in October of 2011, about four months after Roston redeisgnated the last of the Accounts. Accordingly, and like much of the other evidence Belda points to, this is too far removed from the dates of the redesignations to provide the basis for any material inference as to Dr. Roston's mental capacity at the time he executed the change of beneficiary forms.

In order to survive summary judgment, the party challenging an individual's competence to execute a transaction must present evidence that the executing party was incompetent *at the time of execution*, rather than "at some distant or remote time." *In re Stern's Estate*, 28 A.D.2d

207, 208 (N.Y. App. Div. 1967); *see also Bahan*, 2010 WL 3431147, at *3; *In re Estate of Pashad*, 953 N.Y.S.2d 552 (N.Y. Surr. Ct. 2012) (question of capacity turns on "[d]ecedent's requisite mental capacity at the exact time the deed was executed"). To be sure, although capacity must be judged at the exact time of the challenged action, the *evidence* of incapacity need not be precisely contemporaneous. In *Kirshtein v. AmeriCU Credit Union*, 83 A.D.3d 153, 155-56 (N.Y. App. Div. 2011), for instance, the court affirmed a finding of incompetence when there was "evidence establishing that [the] decedent was mentally incompetent both before and after the times in which th[e] [challenged] transfers were made." The nature of that evidence, however, is telling. It included testimony from an attorney that the "decedent did not have the mental capacity to execute a will," as well as testimony from a psychiatric expert that the decedent was "delusional" and "not mentally competent" *prior to* the transfers of stock shares that were at issue. *Id.* at 156. Significantly, the psychiatric expert testified that the decedent's dementia "was not a transitory condition," *id.*, thereby permitting the inference that the decedent's incompetence persisted.

The record here, by contrast, is devoid of any evidence from which a reasonable jury could conclude that Dr. Roston experienced a lasting period of incompetence before October of 2011. The fact that Dr. Roston was unable to make decisions a month before the first redesignation, or reportedly slumped over at a dinner several months after the second redeisgnation, provides no material inference as to his capacity to understand a change of beneficiary form at the time of the redesignations. "The law is clear that in order to set aside a contract or transfer property on the grounds of lack of mental capacity, it is essential to establish that the party did not understand the nature of the transaction at the time of the conveyance as a result of her mental disability." *Lopresto v. Brizzolara*, 91 A.D.2d 952, 955-56 (N.Y. App. Div.

1983).  In sum, none of the evidence presented by Belda raises genuine disputes of material fact as to whether she would be able to meet her heavy burden of showing that Dr. Roston, at the time of the redesignations, was "wholly and absolutely incompetent to comprehend and understand the nature" of his transactions.  *Rudolf Nureyev*, 7 F. Supp. 2d at 416.

Although not her burden, Doerfler provides extrinsic evidence that contrasts sharply with the lack of pertinent evidence introduced by Belda.  This includes a set of detailed handwritten notes that George maintained over the period of time in issue, variously relating to his psychiatric treatment, his medical regimen, and his financial accounts.  *See* Chociey Decl., Exs. L-P.  Doerfler contends that these thorough notes on financial and medical matters, made concurrently with the redesignations, demonstrate that Dr. Roston possessed the capacity to comprehend the nature of the redesignations.

Further, Doerfler also cites the testimony of Dr. Kenneth Shinbach, who began treating George for severe depression on September 1, 2010, approximately ten days after the first redesignation and only a few days before the second.  At their initial meeting on September 1, 2010, Dr. Shinbach stated that he did not find evidence that Dr. Roston experienced confusion, forgetfulness, or cognitive impairment in any area.  *See* Chociey Decl., Ex. R, Shinbach Dep. 19:10-23.  Dr. Shinbach also considered Dr. Roston to have been of sound mind and memory at this time.  *Id.* at 19:24–20:3.  Further, he stated that he believed Dr. Roston to understand the nature and extent of his property and to understand his relation with his heirs and relatives.  *Id.* at 20:18–21:6.  Although he stated that he was not sure whether, as of September 1, 2010, George would have possessed the capacity to manage a checkbook, *id.* at 20:4-17, when asked directly whether he believed that Dr. Roston possessed the mental capacity to comprehend the effect of a

18

beneficiary designation between August 20, 2011 and June 14, 2011, Dr. Shinbach replied in the affirmative, *id.* at 67:16-25.

Belda challenges Dr. Shinbach's conclusion on a number of grounds, including by noting that he never performed certain clinical tests used to asses a person's ability to make financial decisions and that Dr. Shinbach never actually discussed financial matters with either Dr. Roston or Doerfler. *See* Pl.'s Br. 8. This is inapposite. In light of New York's presumption that a person is competent at the time of a challenged action, it is Belda's burden to come forward with evidence raising a triable issue. *See Sears*, 46 A.D.3d at 1284. Accordingly, it is not sufficient for Belda to cast doubt on Doerfler's evidence where it would be her burden at trial to establish Dr. Roston's incompetence at the time of the redesignations. *See Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) ("When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim.") .

In the absence of any genuine dispute of material fact as to Dr. Roston's capacity at the time of the redesignations, or as to whether he was under undue influence at the time, Belda is unable to sustain her claims for unjust enrichment, conversion, and, derivatively, constructive trust. Because no question of fact exists concerning the validity of the changes in beneficiary, Belda cannot demonstrate that "equity and good conscience militate against permitting [Doerfler] to retain" the proceeds of the transfers, *Briarpatch*, 373 F.3d at 306, or that Doerfler has retained the proceeds of the Accounts "to the exclusion of [Belda's] rights," *Kirschner*, 648 F. Supp. 2d at 540. Accordingly, Doerfler's motion for summary judgment is granted as to Belda's claims for unjust enrichment, conversion, and constructive trust.

**B.    Tortious Interference with Contractual Relationships**

"Under New York law, the elements of tortious interference with contract are '(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 401-402 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).  Belda claims that Doerfler intentionally interfered with her agreement with George and LaVerne that she would be the beneficiary to each of the Accounts. *See* Compl. ¶ 49.

However, Belda has failed to present any evidence from which a reasonable jury could conclude that a contract existed between her on the one hand, and George and Laverne on the other.  The parties agree that there is no written agreement purporting to establish that the 2009 designations to Belda were irrevocable. *See* Pl.'s 56.1 Statement ¶ 60.  Belda admits that, after receiving the designation of beneficiary forms from George and LaVerne in early 2009, she never discussed with either of them what the disposition of their assets would be after one of them died. *Id.* ¶ 25.  Nor is there a dispute as to the fact that George, LaVerne, and Belda did not discuss whether the survivor of George and LaVerne would possess the ability or right to redesignate the beneficiaries of the Accounts. *Id.* ¶ 23.  Belda's only evidence that any sort of understanding existed between her and the Rostons in 2009 is her own statement that George and LaVerne told her to "hold onto" the designation forms and that they were there for her "in case something happens to us and so you are taken care of when we die." *Id.* ¶ 61.  This evidence, if admissible, [6] would not be sufficient to allow a reasonable jury to conclude that George and

---

[6] This testimony likely would be inadmissible under New York's Dead Man's Statute.  The Statute bars "a party or a person interested in the event" from testifying on "his own behalf or interest" concerning "a personal

LaVerne intended the 2009 designations to be irrevocable or that they were in any way intending to form a binding agreement with Belda.

Finally, even if Belda were able to demonstrate the existence of an agreement between her and the Rostons, she has failed to raise a triable question as to the second element of the tort, which requires that the tortfeasor be aware of the contract with which they are allegedly interfering. There is no dispute that Belda and Doerfler never discussed George's finances. *Id.* ¶ 101. Although Belda claims to dispute whether Doerfler was aware that Belda had initially been designated as a beneficiary on the Bernstein Account and the TRP Accounts prior to LaVerne's death, she has presented no evidence raising a triable issue of fact on this subject. *Id.* ¶ 64. In sum, in the absence of any evidence establishing the existence of a contract, or any evidence that Doerfler was aware of such a contract, no genuine dispute of material fact exists as to Belda's tortious interference with contract claim.

### C.    Prima Facie Tort

Belda's final claim is for prima facie tort. Under New York law, the elements of prima facie tort are: "(1) an intentional infliction of harm; (2) without excuse or justification and motivated solely by malice; (3) resulting in special damages; (4) by an act that would otherwise be lawful." *McKenzie v. Dow Jones & Co.*, 355 F. App'x 533, 536 (2d Cir. 2009) (quoting *Evergreen Pipeline Constr. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 161 (2d

---

transaction or communication between the witness and the deceased person." *See* N.Y. C.P.L.R. § 4519. Only a limited number of parties have standing to invoke the Dead Man's Statute, however, including "a person deriving his title or interest 'from, through or under' the decedent." *Leake v. McAlister*, No. 07-CV-2947 (CM), 2009 WL 1953446, at *4 (S.D.N.Y. July 1, 2009) (quoting *Blakeslee v. Royal Ins. Co. of Am.*, No. 93-CV-1633 (MBM), 1996 WL 694346, at *6 (S.D.N.Y. Dec. 4, 1996)). Doerfler, who has clearly derived her interest in the Accounts through Dr. Roston (the decedent), would therefore be able to invoke the Statute to prevent Belda from testifying as to conversations she had with Dr. Roston. It is less clear whether Belda, who only *claims* an interest in the Accounts, would similarly have standing to invoke the Statute. The Court need not decide this issue of New York law, however, as the Court would grant Doerfler's motion for summary judgment irrespective of whether the allegedly barred evidence is admissible.

Cir.1996)).   Belda offers no argument as to what genuine questions of material fact remain as to this claim.   It suffices to say that she has presented no evidence that any of Doerfler's conduct was intentionally meant to inflict harm upon her or that it was motivated solely by malice.   *See Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, 361 F. Supp. 2d 283, 308 (S.D.N.Y. 2005) (prima facie tort claim requires plaintiff to demonstrate that defendant was "motivated by disinterested malevolence").   Even to the extent Belda and Doerfler had an unfriendly, or even hostile, relationship, "motives of profit, economic self-interest or business advantage are by their terms not malicious, and their presence, even if mixed with malice or personal animus, bars recovery under prima facie tort." *Rodgers v. Grow-Kiewit Corp.-MK*, 535 F. Supp. 814, 816 (S.D.N.Y.), *aff'd*, 714 F.2d 116 (2d Cir. 1982).   Accordingly, summary judgment is appropriate. *See Vevaina v. Paccione*, 125 A.D.2d 392, 393 (N.Y. App. Div. 1986) (granting summary judgment where plaintiff raised no disputed question of material fact as to whether defendant was motivated solely by malice).

### D.   Declaratory and Injunctive Relief

"Declaratory judgments and injunctions are remedies, not causes of action." *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010).   Because Belda has not sustained any of her claims, any request for declaratory or injunctive relief must be denied.[7]

### IV.   CONCLUSION

---

[7] At the end of Belda's brief opposing Doerfler's motion for summary judgment, she raises new claims regarding specific transactions that Doerfler allegedly engaged in using the powers of attorney she was granted by Dr. Roston.  Pl.'s Br. 21-23.  The Court need not consider these claims, however, as Belda never pled them in her complaint.  *See Perry v. Cnty. of Westchester*, No. 09-CV-9391 (NRB), 2011 WL 5978544, at *4 (S.D.N.Y. Nov. 29, 2011) ("[P]laintiff did not raise this claim in his complaint.  Rather, he raised it for the first time in his opposition to defendants' motion for summary judgment.  As such, the claim is not properly before the Court.").  Even if Belda had timely raised these claims, she could not prevail on them because any challenge to Doerfler's use of money in the Accounts would require Belda to have a legitimate claim to that money.  As the Court has already held, however, Belda has no such claim because she cannot succeed in challenging the redesignations.

In conclusion, Doerfler's motion for summary judgment is GRANTED.  This resolves Dkt. No. 50.  The Clerk of Court is instructed to terminate the case.

SO ORDERED.

Dated: __Sept. 30__, 2015
New York, New York

_____
ALISON J. NATHAN
United States District Judge